**United States District Court**

For the Northern District of California

1

2

3

4

5

6

7        IN THE UNITED STATES DISTRICT COURT

8     FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10   EARNEST HENDERSON, et al,              No   C-05-234 VRW

11          Plaintiffs,                          ORDER

12          v

13   CITY AND COUNTY OF SAN FRANCISCO,
     et al,

14

15          Defendants.

16   _____/

17          Plaintiffs, who are present and former inmates of the San

18   Francisco county jail, claim that the individual sheriff's deputy

19   defendants violated plaintiffs' due process rights by using

20   excessive force against plaintiffs and were deliberately

21   indifferent to plaintiffs' serious medical needs during six

22   separate incidents between December 2003 and December 2004.

23   Plaintiffs also allege that the City and County of San Francisco

24   ("the City"), the San Francisco Sheriff's Department ("SFSD"), the

25   San Francisco Department of Public Health Services and Sheriff

26   Michael Hennessey established various customs and practices that

27   enabled the deputy defendants to violate plaintiffs' constitutional

28   rights.  Doc #1.

**United States District Court**
For the Northern District of California

1    Defendants have moved for summary judgement on all claims

2    and seek sanctions for plaintiffs' alleged violations of the

3    court's protective order.  Plaintiffs have moved to stay the

4    court's hearing pending further discovery pursuant to FRCP 56(f)

5    and have moved for leave to amended their complaint.  For reasons

6    discussed below, defendants' motion for summary judgment is GRANTED

7    in part and DENIED in part and defendants' motion for sanctions is

8    GRANTED.  Plaintiffs' motion for leave to amend their complaint is

9    DENIED.

10

11                              I

12                              A

13    On December 13, 2003, plaintiff Earnest Henderson was a

14    pretrial detainee at San Francisco county jail no 2 when he was

15    allegedly assaulted by the sheriff's deputies.  Candell decl, Ex A;

16    Henderson depo at 14:12-14.  According to Henderson, deputy Young

17    directed Henderson to a holding cell without any explanation except

18    to say "I'm going to make sure you learn to respect me."  Henderson

19    depo at 59:20-73:6, 74:12-21, 75:7-17 and 76:3-8.  Once in the

20    holding cell, deputies Young, Prado and Napata cornered Henderson

21    and then, without provocation, deputy Young punched Henderson's

22    head.  Id at 89:7-23, 90:15-92:2, 92:7-14 and 94:23-96:3.

23    Thereafter, the deputies allegedly threw Henderson to the ground

24    and repeatedly punched Henderson and shoved his face into the

25    floor, id at 103:18-22, 106:4-9 and 107:4-16, until Henderson

26    passed out from the pain, id at 109:23-110:5.

27    Next, Henderson recalls regaining consciousness as he was

28    being dragged to a safety cell by deputies Young and Napata.  Id at

United States District Court

For the Northern District of California

113:18-24 and 114:17-20.  Soon after, a nurse practitioner arrived and provided Henderson with Tylenol, but she refused Henderson's request for hospital treatment.  Id at 132:10-21 and 133:15-20. The nurse practitioner's report stated that "[patient] was able to full[y] bear [weight], able to lift, flex and extend [right] leg" and that there was no evidence of discoloration or swelling. Goldenson decl, Ex Q at 1.  A similar medical report was entered the next morning, id, when Henderson received more Tylenol and was placed in administrative segregation.  Henderson depo at 149:21-150:10.  The following day, Henderson visited jail medical services, and again, the medic on staff refused Henderson's request for hospitalization.  Id at 161:1-162:4.  Later that night, Henderson fell to the ground unconscious; he woke up in San Francisco general hospital.  Id at 166:7-15, 172:11-23 and 179:2-5. Henderson was diagnosed with a L1-transverse process fracture, i e, a minor fracture in his lumbar vertebra.  Goldenson decl, ¶ 61.

Plaintiff Janel Gotta's altercation occurred on March 10, 2006.  Gotta claims the deputies induced a panic attack by informing Gotta that she was to be transferred to Washington state. Gotta depo at 49:11-19.  This panic attack rendered her unable to move, which led the deputies to extract Gotta from her cell.  Id at 55:17-24, 57:16-24, 61:11-14.  During this transfer, Gotta alleges that a deputy lifted up her shirt, pinched her left breast and threatened to injure Gotta.  Id at 78:1-79:9.  Once the deputies placed Gotta in a holding cell, Gotta was denied her request for treatment from jail psychiatric services.  Id at 87:13-23.  Gotta also requested her anti-anxiety medication, which defendants refused as well.  Id at 88:1-6.  A second panic attack ensued and

United States District Court

For the Northern District of California

Gotta began striking her head against the plexiglass wall.  Id 92:25-93:17.  After the panic attack, a nurse practitioner arrived and provided Gotta with Tylenol.  Id at 97:11-15.  Eventually, Gotta was taken to San Francisco general hospital and provided anti-anxiety medication.  Id at 110:14-19.

Plaintiff Aaron Rauls was booked into the San Francisco county jail on May 16, 2004.  Candell decl, Ex H.  The next day, Rauls alleges that several deputies assaulted him without provocation, causing Rauls to soil himself.  Rauls depo at 50:7-58:9, 59:6-19, 62:7-22, 64:6-7 and 65:5-11.  After this incident, the deputies moved Rauls to a safety cell, where Rauls reported pain in his head, back and ankle to jail staff and also requested clean clothes.  Id at 84:11-15.  For seventeen hours, Rauls remained in the safety cell without medical care or clean clothes.  Id at 89:10-11.  During this time, defendants claim Rauls threatened to kill jail personnel and their family, but Rauls denies this allegation, id at 86:5-17 and 88:5-7.  Rauls was then moved to administrative segregation, where he remained for two weeks.  Id at 95:17-96:7.  While in administrative segregation, Rauls received medical evaluation and treatment, Goldenson decl, Ex O, which revealed that he had suffered a minor ankle sprain, id.

Plaintiff Michael Perez's incident occurred July 5, 2004, while he was awaiting trial.  According to Perez, he was leaving the jail gymnasium when he was told to wait behind for deputy Prado.  Perez depo at 45:10-47:15, 59:24-60:6, 62:10-63:6 and 64:2-8.  One minute later, deputy Prado arrived and started punching Perez without provocation.  Id.  Deputy Prado allegedly continued punching and kicking Perez, even as he fell to the ground.  Id at

**United States District Court**
For the Northern District of California

73:11-74:25, 79:10-12, 80:20-24.  After this incident, Perez was placed in administrative segregation, where he remained for ten months.  Id at 115:3-8, 104:7-12, 105:8-20, 106:1-2, 110:15-111:8 and 114:24.

Plaintiff Arturo Pleitez was allegedly assaulted by deputy Prado on November 23, 2004, during a housing transfer. Pleitez states that deputy Prado began punching without provocation, and continued striking Pleitez after he fell to the ground.  Pleitez depo at 37:7-40:25, 47:18-48:10 and 49:20-50:4. The deputies then carried Pleitez to a safety cell.  Id.  While in the safety cell, deputy Prado allegedly forced Pleitez's face into the cell's toilet and tore off Pleitez's clothes, leaving him partially naked.  Id at 54:12-56:8, 56:16-21, 56:13-15, 58:7-59:24. Pleitez claims he did not receive medical care for his "swollen face and black eye."  Id.  The medical records indicate, however, that Pleitez was examined by three different nurses.  Goldenson decl, ¶ 35, Ex N.  None of the nurses identified any injuries, and each noted that Pleitez had no complaints.  Id at ¶¶ 31-36, Ex N.

Plaintiff Mack Woodfox, a pretrial detainee at the San Francisco county jail, was returning to his cell when he was allegedly attacked by deputy Prado.  Candell decl, Ex F.  After the incident, the medical staff provided Woodfox with an ice pack, though Woodfox demanded more thorough care.  Id.  Woodfox was taken to San Francisco general hospital after he lost consciousness two days after the incident.  Id.  At the hospital, medical staff reported that Woodfox suffered a fractured bone in his nose and a broken blood vessel in his eye.  Woodfox depo, at 63:6-9.

**B**

In reviewing a summary judgment motion, the court must determine whether genuine issues of material fact exist, resolving any doubt in favor of the party opposing the motion. "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v Liberty Lobby</u>, 477 US 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id. And the burden of establishing the absence of a genuine issue of material fact lies with the moving party. <u>Celotex Corp v Catrett</u>, 477 US 317, 322-23 (1986). When the moving party has the burden of proof on an issue, the party's showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party. <u>Calderone v United States</u>, 799 F2d 254 (6th Cir 1986). Summary judgment is granted only if the moving party is entitled to judgment as a matter of law. FRCP 56(c).

The nonmoving party may not simply rely on the pleadings, however, but must produce significant probative evidence supporting its claim that a genuine issue of material fact exists. <u>TW Elec Serv v Pacific Elec Contractors Ass'n</u>, 809 F2d 626, 630 (9th Cir 1987). The evidence presented by the nonmoving party "is to be believed, and all justifiable inferences are to be drawn in his favor." <u>Anderson</u>, 477 US at 255. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id at 249.

United States District Court

For the Northern District of California

II

Plaintiffs allege the deputies at San Francisco county jail used excessive force in violation of plaintiffs' due process rights under the Fourteenth Amendment.  Plaintiffs contend the City and County of San Francisco, the SFSD and Sheriff Michael Hennessey are also liable for the deputies' use of excessive force. Defendants have moved for summary judgment on these claims.

A

The Due Process Clause of the Fourteenth Amendment protects a post-arraignment pretrial detainee from the use of excessive force that amounts to punishment.  Graham v Connor, 490 US 386, 395 n10 (1989) (citing Bell v Wolfish, 441 US 520, 535-39 (1979)); compare Pierce v Multnomah County, Oregon, 76 F3d 1032, 1043 (9th Cir 1996) (Fourth Amendment reasonableness standard applies to allegations of use of excessive force against pre-arraignment detainee).  Several circuits have held that excessive force claims brought by pretrial detainees under the Fourteenth Amendment are analytically identical to those brought by prisoners under the Eighth Amendment.  See United States v Walsh, 194 F3d 37, 48 (2d Cir 1999); Riley v Dorton, 115 F3d 1159, 1167 (4th Cir 1997).  Although the Ninth Circuit has not squarely addressed the issue, it has routinely used the Eighth Amendment as a benchmark for evaluating claims brought by criminal pretrial detainees.  See, e g, Redman v County of San Diego, 942 F2d 1435, 1443 (9th Cir 1991) (pretrial detainee alleging due process violation when attacked by other inmates must show deliberate indifference to personal security as would a prisoner bringing such claim under 8th

7

Amendment) (en banc).

In order to demonstrate unconstitutional excessive force, a claimant must show that officials applied force maliciously and sadistically to cause harm.  Hudson v McMillian, 503 US 1, 6-7 (1992).  The Eighth Amendment does not require a specific intent to punish a specific individual.  Robins v Meecham, 60 F3d 1436, 1439 (9th Cir 1995).  Rather, the standard is whether "the defendants applied force 'maliciously and sadistically for the very purpose of causing harm,' -- that is any harm."  Id at 1441 (emphasis in original).

While the extent of injury suffered by an inmate is one of the factors to be considered in determining whether the use of force is wanton and unnecessary, the absence of serious injury does not end the Eighth Amendment inquiry.  Hudson, 503 US at 7. Whether the alleged wrongdoing is objectively "harmful enough" to establish a constitutional violation, see Wilson v Seiter, 501 US 294 (1991), depends on contemporary standards of decency, Hudson, 503 US at 8 (citing Estelle v Gamble, 429 US 97, 103 (1976)).  Such standards are always violated, however, when prison officials maliciously and sadistically use force to cause harm whether or not significant injury is evident.  Id at 8; see also Schwenk v Hartford, 204 F3d 1187, 1196 (9th Cir 2000) (no lasting injury required for sexual assault because sexual assault was deeply offensive to human dignity); Felix v McCarthy, 939 F2d 699, 701-02 (9th Cir 1991) (it is not degree of injury which makes out violation of Eighth Amendment but use of official force or authority that is intentional, unjustified, brutal and offensive to human dignity) (quoting Meredith v Arizona, 523 F2d 481, 484 (9th

United States District Court

For the Northern District of California

Cir 1975)).  Yet not every malevolent touch by a prison guard gives rise to a federal cause of action; indeed, the Eighth Amendment's prohibition of cruel and unusual punishment necessarily excludes from constitutional recognition de minimis uses of physical force. Cf <u>Hudson</u>, 503 US at 9-10 (blows directed at inmate which caused bruises, swelling, loosened teeth and cracked dental plate were not de minimis).

The circuit courts are currently split over whether a prisoner must prove that he suffered more than a de minimis <u>injury</u> in order to prevail on an excessive force claim.  Compare <u>Brooks v Kyler</u>, 204 F3d 102, 108 (3d Cir 2000) ("[A]bsence of objective proof of non-de minimis injury does not alone warrant dismissal.") and <u>Moore v Holbrook</u>, 2 F3d 697, 700 (6th Cir 1993) ("No actual injury needs to be proven to state a viable Eighth Amendment claim.") with <u>Gomez v Chandler</u>, 163 F3d 921, 924 (5th Cir 1999) ("[T]o support an Eighth Amendment excessive force claim a prisoner must have suffered from the excessive force a more than de minimis injury.") and <u>Norman v Taylor</u>, 25 F3d 1259, 1263 (4th Cir 1994) (en banc) (plaintiff must show more than de minimis injury), cert denied, 513 US 1114 (1995).  Although the Ninth Circuit has not addressed the issue, it has strongly suggested that a prisoner need only prove that the use of physical <u>force</u> was more than de minimis. See <u>Oliver v Keller</u>, 289 F3d 623, 628 (9th Cir 2002) (clarifying that in embracing physical injury standard under 42 USC § 1997e(e) adopted by several circuits, Ninth Circuit does not subscribe to reasoning of some of those circuits that 8th Amendment claims require that "the injury must be more than de minimis;" the standard used for 8th Amendment excessive force claims only

examines whether the use of physical <u>force</u> is more than de minimis); see also <u>Schwenk</u>, 204 F3d at 1196-97 n6 (prisoner need not prove any injury "where the assault is one, such as attempted rape, that lacks any legitimate penological justification and is 'offensive to human dignity'").

In determining whether the use of force was wanton and unnecessary, it may also be proper to evaluate the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials and any efforts made to temper the severity of a forceful response. <u>Hudson</u>, 503 US at 7; see also <u>LeMaire v Maass</u>, 12 F3d at 1454 (considering need for application of measure or sanction complained of, relationship between need and measure or sanction used, extent of any injury inflicted and extent of surrounding threat to safety of staff and inmates); <u>Spain v Procunier</u>, 600 F2d 189, 195 (9th Cir 1979) (guards may use force only in proportion to need in each situation).

"Unreasonable force claims are generally questions of fact for a jury." <u>Hervey v Estes</u>, 65 F3d 784, 791 (9th Cir 1995). And the present case is no exception. Indeed, there are at least two significant questions of fact. First, a material question exists regarding the need for any force. Each plaintiff asserts in their depositions that the altercations were triggered by little or no provocation. Defendants respond that "undisputed facts" regarding plaintiffs' conduct render the deputies' force reasonable as a matter of law. See, e g, Doc #122 at 2. But defendants generate these "undisputed facts" through a disingenuous portrayal of plaintiffs' depositions. For example, defendants cite

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

Henderson's deposition that he and deputy Young were "looking each other in the eye" and that Henderson was "turning diagonally right along with" deputy Young.  Id at 3.  From this description, defendants conclude it is undisputed that Henderson was in a "fighting stance."  Id.  Yet this conclusion cannot be derived from Henderson's deposition.  Henderson remarked about looking into Young's eyes because defendants were asking about the alignment of the three deputies before the alleged assault.  According to Henderson, the deputies formed an "arc" around him, such that he and Young were "looking each other in the eye.  [He was] not even looking at Napatia and Prado."  Id 11:52, 7-14.  The statement "I turned diagonally along with him right along with him" responded to defendants question "[s]o did you change the way your body was facing as Young walked in the room?"  This hardly constitutes a "fighting stance;" indeed, most would consider this shift in body posture during conversation a matter of common courtesy.  In any event, whether Henderson turned his body with malice as defendants claim, is a disputed issue for the jury to decide.

Second, assuming that some force was warranted, there is a material issue of fact regarding the amount that was necessary. Again, the appropriate level of force depends on whose version of the events one believes.  Plaintiffs' depositions and declarations designate "specific facts showing that there is a genuine issue for trial."  Celotex Corp, 477 US at 324 (quoting Fed R Civ P 56(e)). The court cannot, therefore, conclude on summary judgment that plaintiffs' rights were not violated.

//

//

11

United States District Court

For the Northern District of California

B

Defendants argue that even if there was a violation of plaintiffs' constitutional rights, the individual deputy defendants are protected by qualified immunity.

Qualified immunity shields state actors from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Harlow v Fitzgerald</u>, 457 US 800, 818 (1982).  "Qualified immunity strikes a balance between compensating those who have been injured by official conduct and protecting government's ability to perform its traditional functions." <u>Wyatt v Cole</u>, 504 US 158, 167 (1992).  "[T]he qualified immunity recognized in <u>Harlow</u> acts to safeguard government, and thereby to protect the public at large, not to benefit its agents." <u>Wyatt v Cole</u>, 504 US 158, 168 (1992).  The Supreme Court does not "draw a distinction for purposes of immunity law between suits brought against state officials under [42 USC] § 1983 and suits brought directly under the Constitution [via <u>Bivens v Six Unknown Named Agents</u>, 403 US 388 (1971)] against federal officials." <u>Butz v Economou</u>, 438 US 478, 504 (1978).

The analysis for qualified immunity entails three steps. First, the court must determine whether the facts, taken in light most favorable to the party asserting the injury, show a violation of the plaintiffs' statutory or constitutional rights. <u>Saucier v Katz</u>, 533 US 194, 201 (2001).  If the court finds a material factual dispute whether a constitutional violation has occurred, then the court determines whether the right infringed was clearly established at the time of the alleged violation. <u>Wilson v Layne</u>,

United States District Court

For the Northern District of California

526 US 603 (1999).  Finally, the court assesses whether it would be clear to a reasonable person in the defendant's position that its conduct was unlawful in the situation it confronted.  <u>Saucier</u>, 533 US at 202, 205.  See also <u>Frederick v Morse</u>, 439 F3d 1114, 1123 (9th Cir 2006) (characterizing this final inquiry as a discrete third step in the analysis).  "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent."  <u>Hope v Pelzer</u>, 536 US 730, 739 (2002) (citation omitted).  For excessive force claims, courts first inquire into the objective reasonableness of the officer's belief in the <u>necessity</u> of his actions, and second, inquire into the objective reasonableness of the officer's belief in the <u>legality</u> of his actions.  <u>Wilkins v City of Oakland</u>, 350 F3d 949, 954-55 (9th Cir 2003).  See also <u>Watts v McKinney</u>, 394 F3d 710, 713 (9th Cir 2005) (stating, in the context of excessive force, that "[t]he Supreme Court did not need to create a catalogue of all the acts by which cruel and sadistic purpose to harm another would be manifest").  Defendants carry the burden of proving their conduct was reasonable under these standards.

The qualified immunity analysis is thus conceptually distinct from the excessive force constitutional analysis.  See <u>Marquez v Gutierrez</u>, 322 F3d 689, 691 (9th Cir 2003).  That is, a deputy may violate an inmate's constitutional right, but still be entitled to qualified immunity if he can show that a reasonable deputy in his position would have believed his response was a good faith effort to restore discipline.  See id at 692-93 (guard who

13

United States District Court

For the Northern District of California

shot passive, unarmed inmate standing near a fight between other unarmed inmates was entitled to qualified immunity because a reasonable official standing where the guard was standing (i e, in a tower 360 feet away from the disturbance) could perceive that both plaintiff and another inmate were threatening a third inmate with serious injury).  Compare Watts v McKinney, 394 F3d 710, 712-13 (9th Cir 2005) (finding that prison guard could not reasonably believe that he could lawfully kick the genitals of a prisoner who was on the ground and in handcuffs).

Defendants claim they are entitled to qualified immunity on all of the plaintiffs' alleged violations.  Yet the factual dispute is too significant for immunity.  According to plaintiffs, the officers attacked without provocation.  Under plaintiffs' version, there exists no "reasonable mistake" under which the deputies could have reasonably believed in the necessity or legality of their conduct.  See Santos v Gates, 287 F3d 846, 855 n12 (9th Cir 2002) (declining to grant qualified immunity "because whether the officers may be said to have made a 'reasonable mistake' of fact or law, may depend upon the jury's resolution of the disputed facts and the inferences it draws therefrom").  See also Hervey v Estes, 65 F3d 784, 791 (9th Cir 1995) (qualified immunity inappropriate in excessive force cases because they raise issues of fact).

In sum, evaluation of plaintiffs' excessive force claims depend principally on credibility determinations and the drawing of factual inferences from circumstantial evidence, both of which are the traditional functions of the jury; hence, a question of material fact exists with respect to the amount of force used by

the officers.  Additionally, "because questions of reasonableness are not well-suited to precise legal determination," Chew v Gates, 27 F3d 1432, 1440 (9th Cir 1994), the jury should be allowed to assess whether the force used by the officers was excessive. Accordingly, the court denies defendants' assertion of qualified immunity.

C

Next, defendants contend that even if the deputies violated plaintiffs' constitutional rights, no policy of practice of San Francisco caused the violation, so neither San Francisco nor final policymaker Sheriff Hennessy can be liable.

Under Monell v Department of Social Services, municipal liability must be based upon enforcement of a municipal policy or custom that caused the deprivation of the plaintiffs' federal right, and not upon the municipality's mere employment of a constitutional tortfeasor.  436 US 658 (1978).  "The 'official policy' requirement * * * intend[s] to distinguish acts of the municipality from acts of employees in order to limit municipal liability to conduct for which the municipality is actually responsible."  Pembaur v Cincinnati, 475 US 469, 478 n6 (1986). Section 1983 liability may be imposed when (1) the enforcement of a municipal policy or custom was (2) "the moving force" of the violation of federally protected rights.  See Plumeau v School Dist #40 County of Yamhill, 130 F3d 432, 438 (9th Cir 1997).

Municipal liability under 1983 may be premised upon an officially promulgated policy, a single decision by an official with final decisionmaking authority, a custom or persistent

15

practice or a deliberately indifferent training or supervision.

For a single decision to trigger liability, it must come from an official with final decisionmaking authority; mere authority to exercise discretion in the course of implementing a municipal policy is insufficient.  <u>Pembaur</u>, 475 US at 483.  "When an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality."  <u>City of St Louis v Prapotnik</u>, 485 US 112, 127 (1988).  But if the authorized policymakers approve a subordinate's determination and the basis for it, "their ratification [is] chargeable to the municipality because their decision is final." Id.  Whether an official has final decisionmaking authority is decided by reference to state and local law.  485 US 112 (1988).

Proof of random acts or isolated incidents of unconstitutional action by a non-policymaking employee are insufficient to establish the existence of a municipal policy or custom.  <u>See McDade v West</u>, 223 F3d 1135, 1142 (9th Cir 2000); <u>Trevino v Gates</u>, 99 F3d 911, 918 (9th Cir 1996); <u>Thompson v City of Los Angeles</u>, 885 F2d 1439, 1444 (9th Cir 1989).  "When one must resort to inference, conjecture and speculation to explain events, the challenged practice is not of sufficient duration, frequency and consistency to constitute an actionable policy or custom." <u>Trevino</u>, 99 F3d at 920.  "Only if a plaintiff shows that his injury resulted from a 'permanent and well settled' practice may liability attach for injury resulting from a local government custom." <u>Thompson</u>, 885 F2d at 1444.

But a plaintiff may prove the existence of a custom or

**United States District Court**

For the Northern District of California

informal policy with evidence of repeated constitutional violations for which the errant municipal officials were not discharged or reprimanded.  See Gillette v Delmore, 979 F2d 1342, 1348 (9th Cir 1992), cert denied, 510 US 932 (1993).  See, e g, Nadell v Las Vegas Metro Police Dep't, 268 F3d 924, 930 (9th Cir 2001) (municipal liability not established when there was no evidence at trial establishing that the use of excessive force was a formal policy or widespread practice of the police department or that previous constitutional violations had occurred for which there was no reprimand or discharge); Gomez v Vernon, 255 F.3d 1118, 1127 (9th Cir 2001) (correctional department administrators may not take a "blind-eye" approach; condoning unconstitutional acts by the failure to investigate or correct the repeated violations creates a policy or custom which permits the issuance of an injunction against the administrators in their official capacity).  Once such a showing is made, a local government may be liable for its custom "irrespective of whether official policymakers had actual knowledge of the practice at issue."  Thompson, 885 F2d at 1444.

Further, municipal liability is available for constitutional deprivations visited pursuant to governmental customs even though such a custom has not received formal approval through the body's official decision making channels.  See Hyland v Wonder, 117 F3d 405, 416 (9th Cir) amended, 127 F3d 1135 (9th Cir 1997) (municipal liability not defeated where executive committee defendants failed to officially report ratification of ban that violated plaintiff's First Amendment rights).

Here, plaintiffs first contend that Sheriff Hennessey should be held liable for the deputies' alleged use of excessive

force because Hennessey ratified the officers' conduct by failing to reprimand them.  Although "[o]rdinarily, ratification is a question for the jury," <u>Christie v Iopa</u>, 176 F3d 1231, 1238-39 (9th Cir 1999), to survive summary judgment, plaintiffs must demonstrate that there is a genuine issue of material fact regarding whether ratification occurred.  In the present cases, plaintiffs claim that Sheriff Hennessey's failure to reprimand the deputies amounts to a ratification of the officers' conduct.  The court disagrees.

Whether a municipality's post-event investigation evidences a policy or custom giving rise to § 1983 liability has been the subject of discussion in a long line of Ninth Circuit cases.  Most recently, in <u>Henry v County of Shasta</u>, 132 F3d 512, 519 (9th Cir 1997), the court held that post-event conduct is "highly probative" to proving the existence of a municipal policy or custom.  For example, a "[p]olicy or custom may be inferred if * * * officials took no steps to reprimand or discharge the [officers involved], or if they otherwise failed to admit the [officers'] conduct was in error."  Id (citing <u>McRorie v Shimoda</u>, 795 F2d 780, 784 (9th Cir 1986)); see also <u>Larez v City of Los Angeles</u>, 946 F2d 630 (9th Cir 1991).  In <u>Henry</u>, the plaintiff's constitutional rights were violated after being stopped for a traffic violation The officers involved were not reprimanded and plaintiff also demonstrated that, after bringing suit, several other officers employed by the county similarly detained other traffic violators.  <u>Henry</u>, 132 F3d at 519.  The court concluded that when a municipality "turn[s] a blind eye to severe violations of inmates' constitutional rights — despite having received notice of such violations — a rational fact finder may properly infer the

18

United States District Court

For the Northern District of California

existence of a previous policy or custom of deliberate indifference."  Id.

While Henry demonstrates that the failure to reprimand may support a finding of a municipal policy or custom, it does not compel this inference.  Indeed, the Ninth Circuit appears to require more than a failure to reprimand to establish a municipal policy or ratification of unconstitutional conduct.  In Henry, for example, the court did not rely exclusively on the failure to reprimand; rather, evidence of other incidents occurring after Henry had filed suit against the County and "after being put on notice unequivocally of its deputies' * * * unconstitutional treatment of Henry," was "persuasive evidence of deliberate indifference or of a policy encouraging such official misconduct." 132 F3d at 519.

Prior to defendants' summary judgment motions, plaintiffs presented almost no evidence that Sheriff Hennessy routinely exonerates deputies of wrongdoing.  Yet before ruling on defendants' motions, the court ordered defendants to respond to plaintiffs' remaining discovery request and instructed plaintiffs to submit a letter brief "[i]f the discovery yields new evidence that would aid the court in deciding" defendants' motions.  Doc #143.  On October 18, 2006, plaintiffs submitted a letter brief and attached several grievances filed in San Francisco county jail no 2.  In their letter, plaintiffs contend the eighteen grievances submitted by jail inmates show that San Francisco has a systematic policy of deliberate indifference to constitutional violations.  Doc #147.  The court disagrees.  Plaintiffs have selected these eighteen grievances from the more than 200 grievances against staff

United States District Court

For the Northern District of California

filed in San Francisco county jail no 2 over a one-year period, during which more than 6000 different inmates were housed in the facility.  Moreover, of the fourteen incidents described by the grievances, many cannot be characterized as constitutional violations; indeed, for five incidents, the inmate reported he was "satisfied" with the response to his complaint.  On plaintiffs' account, then, fewer than one-quarter of one percent of county jail no 2 inmates complain of *any* kind of force in a year.  Compare Thomas v City of Chattanooga, 398 F3d 426, 430-31 (6th Cir 2005) (rejecting custom claim in the absence of evidence that the number of complaints was unusual); Carter v District of Columbia, 795 F2d 116, 123 (DC Cir 1986) (reports of force were "scattered and [did] not coalesce into a discernible 'policy'").  The court agrees with defendants that instead of creating an issue of fact on the existence of a pervasive custom of excessive force, plaintiffs' proffered evidence forecloses it.  Accordingly, the Sheriff Hennessey is not subject to § 1983 liability on a ratification theory.

Alternatively, plaintiffs contend that the City of San Francisco and the sheriff are liable due to deliberately indifferent training and supervision.

Section 1983 municipal liability can be supported by a showing that a municipality's deliberately indifferent training deficiency was the moving force behind the deprivation of the plaintiff's constitutional rights.  Such circumstances arise when "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional

United States District Court

For the Northern District of California

rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." <u>City of Canton v Harris</u>, 489 US 378, 390 (1989).  Accordingly, it will not suffice "to prove that an injury or accident could have been avoided if an officer had [received] better or more training, sufficient to equip him to avoid the particular injury-causing conduct." Id at 391. The Supreme Court adopted such a high standard — i e, deliberate indifference — to avoid having federal courts endlessly "second-guess" the wisdom of municipal training programs, a task the Supreme Court found inappropriate for the federal judiciary.  <u>City of Canton v Harris</u>, 489 US 378, 392 (1989).

Whether a local government entity has displayed a policy of deliberate indifference is generally a question of fact for the jury.  <u>Oviatt</u>, 954 F2d at 1478.  But if a plaintiff fails to introduce evidence from which a jury could infer deliberate indifference, the issue may be resolved summarily.  See, e g, <u>Mateyko v. Felix</u>, 924 F2d 824, 826 (9th Cir 1991), cert denied, 502 US 814 (testimony that officers received only three to four hours of Taser gun training and lacked information as to the Taser's precise effect would at best support a finding of mere negligence). In comparison, cases that have survived defense motions for summary disposition have involved training programs that were far below national standards, <u>Reed v Hoy</u>, 909 F2d 324, 331 (9th Cir 1989), cert denied, 501 US 1250, or virtually nonexistent, <u>Davis v Mason County</u>, 927 F2d 1473, 1482-83 (9th Cir 1991) (judgment for plaintiff as a matter of law).

The court finds that the evidence proffered by plaintiffs regarding other incidents and defendants' response (or lack

thereof) fails to raise a dispute of material fact whether the municipality has a policy or practice of indifference to constitutional violations by officers.   The declarations provided by plaintiffs describe approximately 17 other incidents over the course of 29 months.   But plaintiffs offer no evidence that would enable a fact-finder to put that number in context, by, for example, comparing the number of incidents to that of similar municipalities with better training programs.   Nor do plaintiffs rebut defendants testimony that the number of incidents is relatively small.

Further, defendants demonstrate that the SFSD's training regarding the lawful use of force is extensive and comprehensive. Deputies must undergo rigorous peace officer academy training in a POST-accredited program, then receive core training specific to their operations, and then participate in continuing education and training throughout their careers.

Plaintiffs have thus failed to demonstrate that a triable fact exists whether the City's maintains a municipal policy of deliberate indifference to its deputies' unconstitutional treatment of inmates.   Moreover, plaintiffs' October 18, 2006, letter brief and the attached grievances do not save their <u>Monell</u> claims. Accordingly, the court concludes that no policy or practice of San Francisco caused the violation, so neither San Francisco nor final policymaker Sheriff Hennessy can be liable.

//

//

//

//

United States District Court

For the Northern District of California

III

Defendants also move for summary judgment on plaintiffs' claims of constitutionally deficient medical care.  For reasons that follow, the court GRANTS defendants' summary judgment on these claims.

A pre-trial detainee's claim for deliberate indifference to medical needs derives from the due process clause rather than the Eighth Amendment's protection against cruel and unusual punishment.  <u>Gibson v County of Washoe</u>, 290 F3d 1175, 1187 (9th Cir 2002) (citing <u>Bell v Wolfish</u>, 441 US 520, 535 (1979)).  Yet the same substantive standard applies under both the Eighth Amendment and the Fourteenth Amendment.  <u>Wolfish</u>, 441 US at 535.  A determination of "deliberate indifference" involves an examination of two elements:  the seriousness of the prisoner's medical need and the nature of the defendant's response to that need.  See <u>McGuckin v Smith</u>, 974 F2d 1050, 1059 (9th Cir 1992), overruled on other grounds, <u>WMX Technologies, Inc v Miller</u>, 104 F3d 1133, 1136 (9th Cir 1997) (en banc).

A "serious" medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the "unnecessary and wanton infliction of pain."  Id (citing <u>Estelle v Gamble</u>, 429 US 97, 104 (1976).  Examples of indications that a prisoner has a "serious" need for medical treatment include the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment, the presence of a medical condition that significantly affects an individual's daily activities or the existence of chronic and substantial pain.  Id at 1059-60 (citing <u>Wood v Housewright</u>, 900

United States District Court

For the Northern District of California

F2d 1332, 1337-41 (9th Cir 1990)).

A prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk of serious harm and disregards that risk by failing to take reasonable steps to abate it.  Farmer v Brennan, 511 US 825, 837 (1994).  The prison official must not only "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," but he "must also draw the inference."  Id.

In order for deliberate indifference to be established, therefore, there must be a purposeful act or failure to act on the part of the defendant and resulting harm.  See McGuckin, 974 F2d at 1060; Shapley v Nevada Bd of State Prison Comm'rs, 766 F2d 404, 407 (9th Cir 1985).  A finding that the defendant's activities resulted in "substantial" harm to the prisoner is not necessary, however.  Nor must plaintiffs demonstrate that the defendant's actions were egregious.  McGuckin, 974 F2d at 1060, 1061 (citing Hudson v McMillian, 503 US 1, 7-10 (1992) (rejecting "significant injury" requirement and noting that Constitution is violated "whether or not significant injury is evident")).  Nevertheless, the existence of serious harm tends to support an inmate's deliberate indifference claims.  Jett v Penner, 439 F3d 1091, 1096 (9th Cir 2006) (citing McGuckin, 974 at 1060).

Once the prerequisites are met, it is up to the factfinder to determine whether deliberate indifference was exhibited by the defendant.  Such indifference may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown in the way in which prison officials provide medical care.  See McGuckin, 974 at 1062 (delay

United States District Court

For the Northern District of California

of seven months in providing medical care during which medical condition was left virtually untreated and plaintiff was forced to endure "unnecessary pain" sufficient to present colorable § 1983 claim).  Compare <u>Clement v Gomez</u>, 298 F3d 898, 905 (9th Cir 2002) (jury could find deliberate indifference where officials denied showers and medical attention to inmates who had been exposed to pepper-spray); and <u>Lopez v Smith</u>, 203 F3d 1122, 1132 (9th Cir. 2000) (en banc) (summary judgment should not have been granted to defendants where plaintiff presented evidence that prison officials failed and refused to follow doctor's orders for a liquid diet for plaintiff whose mouth had been wired shut to treat a broken jaw); with <u>Toguchi v Chung</u>, 391 F3d 1051, 1058-60 (9th Cir 2004) (summary judgment in favor of defendant doctor appropriate where evidence showed doctor did not believe that Cogentin use presented a serious risk of harm to plaintiff; claim that doctor failed to conduct a differential diagnosis did not amount to more than negligence and claim that doctor failed to employ emergency treatment was conclusory); <u>Hallett v Morgan</u>, 296 F3d 732, 745-46 (9th Cir 2002) (plaintiffs could not prove 8th Amendment violation in class action because they "have not demonstrated that delays occurred to patients with [dental] problems so severe that delays would cause significant harm and that Defendants should have known this to be the case").

A plaintiff need not prove a complete failure to treat. Deliberate indifference may be shown where access to medical staff is meaningless as the staff is not competent and does not render competent care.  <u>Ortiz v City of Imperial</u>, 884 F2d 1312, 1314 (9th Cir. 1989) (summary judgment reversed where medical staff and

doctor knew of head injury, disregarded evidence of complications
to which they had been specifically alerted and without examination
prescribed contraindicated sedatives).  Yet in order to prevail on
a claim involving choices between alternative courses of treatment,
a plaintiff must show that the course of treatment the doctors
chose was medically unacceptable under the circumstances and that
he or she chose this course in conscious disregard of an excessive
risk to plaintiff's health.  <u>Toguchi</u>, 391 F3d at 1058; <u>Jackson v
McIntosh</u>, 90 F3d 330, 332 (9th Cir 1996) (citing <u>Farmer v Brennan</u>,
511 US 825, 837 (1994)).

　　　　Moreover, medical malpractice or negligence is
insufficient to make out a constitutional violation.  See <u>Toguchi</u>,
391 F3d at 1060-61; <u>Hallett v Morgan</u>, 296 F3d 732, 744 (9th Cir
2002); <u>Frost v Agnos</u>, 152 F3d 1124, 1130 (9th Cir 1998) (finding no
merit in claims stemming from alleged delays in administering pain
medication, treating broken nose and providing replacement crutch,
because claims did not amount to more than negligence); <u>McGuckin</u>,
974 F2d at 1059 (mere negligence in diagnosing or treating a
medical condition, without more, does not violate a prisoner's
constitutional rights); <u>O'Loughlin v Doe</u>, 920 F2d 614, 617 (9th Cir
1990) (repeatedly failing to satisfy requests for aspirins and
antacids to alleviate headaches, nausea and pains is not
constitutional violation; isolated occurrences of neglect may
constitute grounds for medical malpractice but do not rise to level
of unnecessary and wanton infliction of pain); <u>Anthony v Dowdle</u>,
853 F2d 741, 743 (9th Cir 1988) (no more than negligence stated
where prison warden and work supervisor failed to provide prompt
and sufficient medical care).

United States District Court

For the Northern District of California

1    Even liberally construed, plaintiffs' version of the

2    incidents state at most a claim for negligence, not

3    constitutionally deficient medical care.  For example, Henderson's

4    fracture was so minor that it did not appear on his x-ray; only a

5    CT scan revealed the fracture.  So it is not surprising or

6    troublesome that this diagnosis arose two days after the incident.

7    The constitution does require a prison to administer CT scans and

8    X-rays on prisoner demand.

9    Further, several plaintiffs criticize the medical staff's

10   use of Motrin and Tylenol for treatment before receiving further

11   medical tests.  Again this does not amount to constitutionally

12   deficient care.  Indeed, patients who wait in the average emergency

13   room receive no better treatment.

14   Finally, the constitution does not require medical staff

15   to defer to a prisoner's preferred medical regimen.  For example,

16   Janel Gotta claims she was "begging" to see someone from the jail

17   psychiatric unit, but instead was treated by jail medical staff.

18   Goldenson decl, ¶ 49.  It was not until a second panic attack that

19   she was examined by medical and psychiatric staff and sent to the

20   hospital for treatment.  Id.  Because Gotta received treatment

21   throughout the entire incident, her complaint, in essence, is that

22   her psychiatric treatment was not immediate.  But minor delay in

23   treatment without more is insufficient to state a claim of

24   deliberate medical indifference.  Shapley v Nevada Bd of State

25   Prison Commissioners, 766 F2d 404, 408 (9th Cir 1985).  Gotta's

26   claim for constitutionally deficient medical care cannot survive

27   summary judgment.

28   Because the court finds there was no violation of

**United States District Court**

For the Northern District of California

plaintiffs' constitutional rights regarding medical care, the court declines to address defendants contention that no policy or practice of San Francisco caused the violation.

IV

Plaintiffs Henderson, Rauls and Perez allege they were placed in administrative segregation in violation of their Fourteenth Amendment rights.  Defendants have moved for summary judgment on this issue.  For reasons that follow, the court GRANTS defendants' motions for summary judgment on plaintiffs' claims arising from their administrative segregation.

For a due process claim from a pretrial detainee, the court first assesses whether the alleged deprivation amounts to punishment and therefore implicates the due process clause itself; if so, the court then determines what process is due.  See, e g, <u>Bell v Wolfish</u>, 441 US 520, 537-38 (1979) (discussing tests traditionally applied to determine whether governmental acts are punitive in nature).

The court first finds that the nature and length of the administrative segregation for plaintiffs Henderson and Rauls — lasting two days and two weeks, respectively — does not give rise to a constitutionally protected liberty interest.  The deprivation for both plaintiffs is far less than the 30 days' solitary confinement the Supreme Court held did not constitute an "atypical and significant hardship" requiring procedural protections in <u>Sandin v Conner</u>, 515 US 472, 484 (1995).  See also <u>May v Baldwin</u>, 109 F3d 557, 565 (9th Cir 1997) (mere placement in administrative segregation not enough to state claim after <u>Sandin</u>); <u>Mujahid v</u>

United States District Court

For the Northern District of California

1    <u>Meyer</u>, 59 F.d 931, 932 (9th Cir. 1995) (despite prior case law

2    determining disciplinary regulations created liberty interest,

3    under <u>Sandin</u> no liberty interest when inmate placed in disciplinary

4    segregation for 14 days).

5         The administrative segregation would not implicate a

6    constitutionally protected liberty interest even if the court

7    declines to apply <u>Sandin</u> and instead inquires into whether

8    California law creates a constitutionally protected entitlement for

9    pretrial purposes.  See <u>Valdez v Rosenbaum</u>, 302 F3d 1039, 1044 n3

10   (9th Cir 2002).  The relevant regulation, California code of

11   regulations title 15, section 1053, does not require, in explicitly

12   mandatory language, that if substantive predicates are met, a

13   particular outcome must follow.  See <u>Smith v Noonan</u>, 992 F2d 987,

14   989 (9th Cir 1993) (provision that merely raises procedural

15   requirements without substantive predicates, even if mandatory, not

16   enough).  It merely directs detention facility administrators to

17   segregate administratively inmates who are determined to be prone

18   to escape, prone to assault staff or other inmates or likely to

19   need protection from other inmates.  See Cal Code Regs, tit 15, §

20   1053.

21        Plaintiff Perez's ten months in administrative

22   segregation, however, survives the threshold requirement of

23   implicating the due process clause.  Pretrial detainees may not be

24   subjected to disciplinary segregation as punishment for violation

25   of jail rules and regulations without a due process hearing to

26   determine whether they in fact have violated any rule or

27   regulation.  <u>Mitchell v Dupnik</u>, 75 F3d 517, 524-25 (9th Cir 1996)

28   (citing <u>Wolff v McDonnell</u>, 418 US 539 (1974)).  But detainees may

be segregated for administrative or security reasons with less

procedural due process: (1) an informal nonadversary hearing

within a reasonable time after placement in segregation, (2) notice

of the reasons segregation is being considered, and (3) an

opportunity for the detainee to present his views. See <u>Toussaint v</u>

<u>McCarthy</u>, 801 F2d 1080, 1100 (9th Cir 1986). Following placement

in administrative segregation, prison officials also must engage in

some sort of periodic review of the detainee's confinement in

administrative segregation. Id at 1101.

In support of their motion for summary judgment on

Perez's claim, defendants submit declarations and accompanying

evidence which establish the following: (1) correctional officials

decided to administratively segregate Perez after he spent one

month in lock-up because he was prone to assaulting staff, not to

punish him; (2) correctional officials held an informal

non-adversary hearing, informed Perez of the reasons for placement

in segregation and provided him with an opportunity to present his

views and (3) correctional officials reviewed Perez's continued

placement in administrative segregation with frequent follow-up

interviews. See Doc #67 (St Hilaire decl). In sum, defendants

contend that Perez was properly segregated for administrative and

security reasons and that he received all the process he was due.

Defendants also point out that Perez admits to receiving

these procedural protections. In his deposition, Perez conceded

that he was issued a notice, that he had violated jail rules after

his altercation with deputy Prado, and that he received a copy of a

report describing the incident. Perez depo, 101:6-7, 117:6-13.

Perez also admitted he received a hearing about the incident from

United States District Court

For the Northern District of California

lieutenant Macauley, who interviewed Perez about the incident.  Id at 99:14-100:6.

All three plaintiffs nevertheless contend there are genuine issues of material fact which preclude summary judgment in favor of defendants.  In order to withstand defendants' motion for summary judgment, however, plaintiffs must "go beyond the pleadings, and by [their] own affidavits, or by 'depositions, answers to interrogatories, or admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex Corp, 477 US at 324 (quoting Fed R Civ P 56(e)). Plaintiffs submit largely conclusory declarations in which they asserts they were denied due process because the informal hearings were brief and unhelpful.  Plaintiffs' assertions (assuming arguendo that they are not conclusory) do not genuinely contradict defendants' showing that they segregated plaintiffs for administrative and security reasons and that they provided plaintiffs with all the process they were due.  Plaintiffs have failed to set forth specific facts showing that there is a genuine issue for trial, and therefore defendants are "entitled to judgment as a matter of law."  Celotex Corp, 477 US at 323.

V

The court next addresses plaintiffs' motion to amend their complaint.  Doc #83.  Plaintiffs filed their initial complaint on January 14, 2005.  Doc #1.  Plaintiffs now seek to (1) substitute six "Doe" defendants with newly identified individual defendants, (2) add state law claims for violations of Cal Civ Code §§ 43, 52(1)(a) and 1701(5) in counts seventeen through twenty-

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

eight and (3) withdraw their fourth, seventh and thirteenth causes of action.  Doc #83-1 at 3.

Plaintiffs' motion relies on FRCP 15.  Doc #83-1 part II(A).  At this juncture, Rule 15(a) allows plaintiffs to amend their complaint only "by leave of court or by written consent of the adverse party."  FRCP 15(a).  Since defendants have "declined to stipulate to the amendment * * *," doc #83 at 2, plaintiffs' only avenue for amendment is by leave of court.

Under Rule 15(a), "leave [to amend] shall be freely given when justice so requires," FRCP 15(a), although this decision falls within the discretion of the district court.  Forman v Davis, 371 US 178, 182 (1962).  "In exercising this discretion, a court must be guided by the underlying purpose of Rule 15 — to facilitate decision on the merits, rather than on the pleadings or technicalities."  Roth v Garcia Marquez, 942 F2d 617, 628 (9th Cir 1991) (citing US v Webb, 655 F2d 977, 979 (9th Cir 1981)).  The existence of bad faith, undue delay, prejudice to the opposing party or futility of amendment, however, may justify denial.  Forman, 371 US at 182.  Plaintiffs argue the court should allow amendment since none of the aforementioned Forman factors is present.  Doc #83-1 at 3.  Defendants, however, allege the existence of both undue delay and bad faith, and for those reasons argue plaintiffs' motion to amend should be denied.  Doc #131.

Defendants allege that plaintiffs acted with undue delay by "wait[ing] until after the motions for summary judgement were filed" to seek leave.  Id at 4.  Defendants further allege bad faith because plaintiffs "seek[] to add new defendants, causes of action and legal theories in an effort to avoid imposition of

32

United States District Court

For the Northern District of California

summary judgment."  Id at 3.  Undue delay in combination with a showing of other <u>Forman</u> factors, can be sufficient for denial. <u>Bowles v Reade</u>, 198 F3d 752, 758 (9th Cir 1999) (internal citations omitted).

During the January 24, 2006, case management conference, plaintiffs agreed to amend their complaint "to name additional individual deputies * * *, and [to] add or drop other allegations as part of the amendment process" once plaintiff Gotta "review[ed] photographs of sheriff's deputies and [sat for] a deposition."  Doc #27 part IV(B).  The pictures were produced on April 24, 2006, and the deposition took place on April 27, 2006.  Flynn decl, ¶ 3-4. At the same conference, plaintiffs were put on notice of defendants' intent to file a motion for summary judgment on or near June 12, 2006.  Doc #27 part IV(D).  On July 6, 2006, defendants filed their motion for summary judgment.  Doc #55.  Six weeks later, on August 23, 2006, plaintiffs filed this motion to amend. Doc #83-1.

As a preliminary matter, plaintiffs do not assert any reason why they did not file sooner.  See doc #83-1.  Moreover, defendants allege plaintiffs have known the "identity and alleged roles of proposed defendants Sergeant Sears and Deputies James, Antonioti, Cabebe[] and Gonzalez since August 2005" and of Deputy Turner since April 2006, after they received deputies' photographs. Doc #131 at 3.

Plaintiffs should have sought leave to amend, as promised, after plaintiff Gotta reviewed the photographs and was deposed.  At the very least, plaintiffs had from April 27, 2006 (the date of Gotta's deposition), until June 12, 2006 (anticipated

33

**United States District Court**

For the Northern District of California

date of defendants' motion for summary judgment), to produce the proposed amendments and seek leave of court. Six weeks is more than enough time to complete such a task. Defendants, moreover, did not file their motion until almost a month later, giving plaintiffs an additional two weeks (at the very least) to seek leave.

That plaintiffs had over six months to conduct additional discovery and uncover additional defendants and causes of action, coupled with plaintiffs' inexplicable delay in seeking leave to amend until over six weeks after defendants filed their motion for summary judgment suggests that plaintiffs waited to amend until they had the opportunity to assess the merits of defendants' summary judgment motion. These actions indicate plaintiffs delayed in order to avoid imposition of summary judgment. Accordingly, the court **DENIES** plaintiffs leave to amend their complaint.

                              VI

Finally, the court turns to the issue of sanctions, which defendants seek for plaintiffs' repeated violation of the court's protective order. Doc #152. For reasons that follow, the court **GRANTS** defendants' motion for sanctions.

Early in this litigation, plaintiffs requested that defendants produce confidential personnel information of individual depute sheriffs concerning previous excessive force complaints against them. To protect this sensitive information, the parties stipulated to a protective order requiring that personnel information be kept confidential. Doc #26.

During discovery, a dispute arose regarding plaintiffs

United States District Court

For the Northern District of California

1  request for all grievances related to claims of excessive force or

2  medical indifference filed in all jail facilities from December 13,

3  1998 to the present time.  Defendants opposed such requests,

4  asserting they invaded the privacy of unnamed deputies unrelated to

5  the litigation.  The court rejected defendants' position,

6  concluding that defendants' concerns regarding confidentiality

7  "ignore the court's protective order, which addresses this very

8  issue."  Doc #110 at 4.  The court stated:

> To the extent the proposed discovery relates to the
> individual defendants, it is expressly contemplated by
> the protective order.  Moreover, defendants concede that
> they want this 'strictly drawn protective order' to
> 'apply to any documents or information produced here.'
> Dempsey Decl., ¶ 27.  Because the whole point of the
> protective order was to enable defendants to produce
> material of the type requested here, the court sees no
> reason why plaintiffs' proposed compromise is
> problematic to defendants.
>
> The court also observes that if plaintiffs or
> plaintiffs' counsel are responsible for the unauthorized
> disclosure of any of the confidential information in the
> grievances, they 'may be subject to sanctions and
> contempt.'  Protective Order, ¶ 9.  *This palpable threat
> of sanctions should prevent the release of any protected
> information.*
>
> * * *
>
> Accordingly, defendants are hereby ORDERED to provide
> plaintiffs with all grievances classified as 'complaints
> against staff' that were filed in San Francisco county
> jail #2 between May 1, 2003 and May 1, 2004.  The
> provisions of the stipulated protective order (Doc #26)
> govern the disclosure of these documents.  Id at 4-5
> (emphasis added).

Because plaintiffs violated the protective order after the

parties submitted the discovery issue but before the court issued

its September 1, 2006, order, defendants moved for reconsideration,

arguing that plaintiffs' violation demonstrated they should not be

trusted to obey the court's protective order.  Doc #112.  Although

United States District Court

For the Northern District of California

1   troubled by plaintiffs' apparent carelessness, the court declined to

2   reverse its discovery order because the grievances had not been

3   produced, hence, the effect of an order denying production could not

4   be measured.  Doc #143.  The court nevertheless invited defendants

5   to move for sanctions in connection with the alleged violations of

6   the protective order.  Id.

7            On October 18, 2006, plaintiffs disregarded the protective

8   order, again.  Upon receipt of the requested inmate grievances

9   against jail staff, plaintiffs promptly e-filed in the public docket

10  30 pages of the confidential material.  Doc #144.  Plaintiffs claim

11  they "did not intentionally disregard or disobey a court order, and

12  instead may have simply misinterpreted it."  Doc #162.  The court

13  cannot comprehend how its orders could be read to authorize

14  plaintiffs' public filing.  This disclosure violates the court's

15  protective order, Doc #26, the court's discovery order, Doc #110,

16  and the court's order denying reconsideration, Doc #143.  Even

17  accepting plaintiffs' implausible interpretation, the court's *three*

18  orders at least oblige plaintiffs to seek clarification before

19  filing the materials publicly.

20           Throughout this discovery, the court has assured

21  defendants that the "palpable threat of sanctions [would] prevent

22  the release of any protected information."  Doc #110.  Yet

23  plaintiffs have proved the court wrong — twice.  Accordingly, the

24  court must follow through on its threat and GRANT defendants' motion

25  for sanctions.

26           Turning to the question of the amount that should be

27  awarded, the court finds defendants' request reasonable.  Defendants

28  seek compensation for 2.75 hours of attorney time in connection with

United States District Court

For the Northern District of California

1   plaintiffs' first violation, including reviewing plaintiffs'

2   documents filed in opposition to summary judgment, contacting and

3   meeting and conferring with plaintiffs regarding the violation and

4   reviewing and executing stipulations regarding re-filing those

5   documents under seal.  Flynn decl, ¶ 14.  For the second violation,

6   defendants seek compensation for 1.25 hours of attorney time.  Id.

7   Defendants seek compensation for 2.0 attorney hours in preparing

8   their administrative motion to seal plaintiffs' letter brief and

9   14.0 hours for their motion for sanctions and its accompanying

10  declarations.  Id.  The court finds the claimed time reasonable.

11  Defendants' counsel's work product was at least of the quality of a

12  reasonably skilled attorney, and the number of hours expended are

13  reasonable in light of the fairly simple -- but not utterly trivial

14  -- nature of the papers that defendants needed to file.

15          The court further finds the claimed rates of $175/hour for

16  Mr Keith and $184/hour for Mr Flynn reasonable both because they

17  constitute the internal rate billed to the City and because they

18  comport with rates the court has found reasonable in similar

19  contexts.  See, e g, Yahoo!, Inc v Net Games, Inc, 329 F Supp 2d

20  1179, 1189-92 (N D Cal 2004) (finding a $190/hour rate to be

21  reasonable).  Accordingly, the court awards defendants $3626.00, to

22  be satisfied by plaintiffs' counsel.  The court also GRANTS

23  defendants' unopposed administrative motion to seal plaintiffs'

24  letter brief (Doc #147).

25  //

26  //

27  //

28  //

VII

                In sum, the court GRANTS defendants' motion for summary
judgment on plaintiffs' claims for constitutionally deficient
medical care, GRANTS summary judgment on plaintiffs' claims for
excessive force against the City and County of San Francisco, the
San Francisco Sheriff's Department and Sheriff Michael Hennessey,
GRANTS summary judgment on plaintiffs' claims regarding
administrative segregation against Sheriff Hennessey and DENIES
summary judgment on plaintiffs' excessive force claims against
individual deputies.  The court also DENIES plaintiffs' motion for
leave to amend their complaint and GRANTS defendants' motion for
separate trials of plaintiffs' claims.  Finally, plaintiffs' counsel
is ORDERED FORTHWITH to pay defendants their attorney fees in the
amount of $3626.00.

                IT IS SO ORDERED.


                _____

                VAUGHN R WALKER
                United States District Chief Judge

United States District Court

For the Northern District of California