# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EARNEST HENDERSON, JANEL GOTTA, AARON RAULS, MICHAEL PEREZ, ARTURO PLEITEZ, <br><br>      Plaintiffs <br><br>  v. <br><br> CITY AND COUNTY OF SAN FRANCISCO, SAN FRANCISCO SHERIFF'S DEPARTMENT, SAN FRANCISCO DEPARTMENT OF PUBLIC HEALTH SERVICES, SHERIFF MICHAEL HENNESSEY, DEPUTY GLENN YOUNG, DEPUTY MIGUEL PRADO, DEPUTY LARRY NAPATA, AND DOES 1-11, <br><br>     Defendants. | Case No.C05-0234 VRW/WAF <br><br> ORDER <br><br> DENYING DEFENDANTS' MOTION FOR MISTRIAL (EARNEST HENDERSON TRIAL) <br><br><br> Date Action Filed: Jan. 14, 2005 <br> Pretrial Conference: Sept. 14, 2007 <br> Trial Judge: William A. Fletcher <br> Trial Date: Sept. 24, 2007 |

On September 17, 2007, the Court granted in part plaintiff's motion in limine 7 regarding the admissibility of certain evidence under Federal Rule of

Evidence 404(b), and the Court provided further explanation for that ruling in an order filed under seal on September 21, 2007.  On October 1, 2007, at the close of plaintiff's case in chief, defendants orally moved for a mistrial for reasons related to the admission of evidence admitted under Federal Rule of Evidence 404(b).  The Court denied the motion without prejudice and informed defendants that they may submit a written motion for the Court's further consideration.  On October 5, 2007, defendants filed a written motion for mistrial, examining the evidence presented at trial in light of the Court's order, and raising as a secondary issue plaintiff's arguments about punitive damages.  The Court orally denied the motion on October 5, but adjusted its draft jury instructions to take into account several issues raised by defendants' motion.  The Court now provides its reasoning for denying the motion.

## I.  THE 404(B) EVIDENCE WAS PROPERLY ADMITTED

The Court notes at the outset that in reviewing the evidence presented at trial, the Court is not endorsing the credibility of any witnesses or the veracity of any theories presented.  The Court is simply observing that a rational jury could reach certain conclusions, based on the evidence presented.  The Court also notes that it does not yet have access to complete transcripts of the proceedings.  Testimony for which a transcript is already available is noted with appropriate page

2

and date references.  Other testimony is reconstructed from the Court's notes and represents only an approximation of what was said at trial.[1]

As the Court noted in its Order of September 21, 2007, *Duran v. Maywood* sets forth the appropriate test for admissibility of evidence under Rule 404(b).  221 F.3d 1127, 1132-33 (9th Cir. 2000).  Defendants do not dispute that the first two prongs are met.  The third prong requires that the other act be "introduced to prove a material issue in the case."  *Id.* at 1133.  The fourth prong requires that the other act be "in some cases, . . . similar to the offense charged."  *Id.*

Also relevant to the Court's analysis of the admissibility of the other acts evidence are the elements of the constitutional violation alleged by plaintiff and the justifications for use of force asserted by the defendants.  For present purposes, it is most efficient to articulate those elements by restating the relevant jury instructions applicable in this case.

Instruction 14:

> In order for plaintiff Henderson to prove that one or more of the defendants used excessive force in violation of his constitutional rights, he must prove by a preponderance of the evidence that one or more of the defendants inflicted pain or injury on him unnecessarily and wantonly.  One definition of unnecessary and wanton infliction of pain or injury is the sadistic and malicious infliction of pain or injury

---

[1]The Court is presently in communication with the Court Reporter to verify these approximations and may modify this order accordingly.

for the very purpose of causing harm.  Another definition is the infliction of pain or injury totally without penological justification.  In this context, penological justification means justification based on maintaining order and safe conditions in the jail. . . .

Instruction 15:

A defendant may be found to have used excessive force if by his intentional and knowing actions he was an integral participant in the use of such excessive force by another defendant or by other defendants.  It is not necessary for a finding of excessive force that you find that the defendant himself actually used the force in question.  A defendant's mere presence, without more, is an insufficient basis upon which to find liability.

Also relevant is the Court's instruction specifically relating to the 404(b) incidents.

Instruction 19:

You have heard evidence of misconduct in incidents involving Miguel Prado and inmates other than Earnest Henderson.  You should be mindful of the fact that Larry Napata and Glenn Young were not involved in these other incidents.

You may consider evidence of these other incidents for the purpose of assessing Miguel Prado's motive, intent, or plan in the incident involving Earnest Henderson.  But you may not simply assume that if Miguel Prado has committed other misconduct, he committed misconduct toward Earnest Henderson.  Rather, your decision regarding Earnest Henderson's case must be based on all of the evidence you have heard with regard to Earnest Henderson's case.

## A.   THE 404(B) EVIDENCE RELATES TO MATERIAL ISSUES IN THE CASE

Defendants emphasize that plaintiff presented no evidence that Deputy

Prado was a "key player" in the incident with Earnest Henderson.  The Court first

recognizes that Deputy Prado need not be a "key player" in order to be found

liable.  Plaintiff has presented sufficient evidence for a reasonable jury to conclude

that Deputy Prado was more than "merely present" in the Multi-Purpose Room.

First, the evidence suggests that the deputy assigned to block B is not normally the

custodian of the keys to the Multi-Purpose Room, and yet Deputy Prado may have

had the keys to the Multi-Purpose Room at the time of the incident.  *See* Young

Tr., Oct. 1, 2007, at 33, 63, 74.  Second, Deputy Prado admitted that he assisted in

handcuffing Henderson.  A rational jury could accept Henderson's testimony that

he was first handcuffed, and then beaten.  Henderson Tr., Sept. 26, 2007, at 25-27.

To the extent that a rational jury could reasonably conclude that Henderson was

handcuffed so as to facilitate the beating and to minimize his ability to resist, the

evidence suggests that Deputy Prado was more than a mere bystander to the

incident.  Third, Henderson testified that Deputy Prado kicked him.  This

testimony is consistent with Henderson's statement that soon after he fell to the

ground, "All of a sudden I feel hands and feet all over me . . . ."  Henderson Tr.,

Sept. 26, 2007, at 23.  It is also consistent with his statement that, as Deputy Young

was "trying to smash my head in the concrete, I felt something like kicking me in

my side.  And I felt another officer – I felt my shirt lift up in the back, and I just

felt this pain in the back like somebody was just pounding me in my back area . . . .

5

As they're doing that, Young is punching me on my face . . . ." *Id.* at 26.  There is no dispute that there were only three deputies in the Multi-Purpose Room. Henderson's descriptions are consistent with all three deputies being physically involved in the alleged use of force.  Fourth, Henderson testified that by the time he was in the safety cell, Deputy Prado said, "'give me some gloves, some brand new gloves first,' because he had some plastic gloves, and I guess they were ripped or whatever." *Id.* at 29.  This testimony suggests that at some point Deputy Prado had used his hands to exert some degree of force on Henderson.  A rational jury could conclude that Henderson did lose consciousness at some point, and that Deputy Prado used his hands to exert some force on Henderson during that time, thereby tearing his gloves.  *See* Henderson Tr., Sept. 26, 2007, at 83-84 ("Q: That was the extent of [Deputy Prado's] involvement in what happened in the multipurpose room? A: That I can remember because I passed out.").  Fifth, if the jury credits Henderson's testimony that all three deputies silently entered the Multi-Purpose Room and formed a semi-circle around him, Henderson Tr., Sept. 26, 2007, at 22-23, they may conclude that even if Deputy Prado did not play a major physical role in the altercation that followed, he was nonetheless an "integral participant" in the use of force by the other deputies because his presence was used to facilitate their alleged application of excessive force.  Sixth, if the jury credits

6

Henderson's contention that Deputy Prado served as a lookout during the incident, *id.* at 27, then it may rationally conclude that Deputy Prado was an integral participant through his efforts to prevent others from discovering what was happening in the Multi-Purpose Room.

To the extent that the jury must determine whether Deputy Prado was an integral participant in the incident or merely present in the Multi-Purpose Room, the other acts evidence may be relevant to proving Deputy Prado's motive for his actions while in the room.  The incident with Joel Correa was chronologically the first of the other act incidents in which Deputy Prado was allegedly involved.  It took place in an area with an active security camera, and Lieutenant Ginns testified that she confronted Deputy Prado immediately after observing the incident on the monitor.  Deputy Prado testified that he was upset by Lieutenant Ginns's reaction because he wasn't "getting any support from [his] own people."  Prado Tr., Sept. 25, 2007, at 23.  The evidence presented about the Correa incident could lead a rational jury to conclude that Deputy Prado had a motive for standing lookout during the incident with Earnest Henderson; he did not want to be disciplined by a supervisor, and he did not want to risk not getting support from other staff if they should happen to enter the room and see what was happening.  Likewise, Jerome Houston and Arturo Pleitez testified about incidents which allegedly happened in

the remote "Processing Room."  *See* Prado Tr., Sept. 25, 2007, at 55.  Mack

Woodfox testified that Deputy Prado attacked him in a relatively isolated corridor

between the Main Line and the Multi-Purpose Room.  A rational jury could

conclude that Deputy Prado selected these locations because they are not readily

visible to other deputies, supervisors, or inmates.  *See id.* at 42-43.  Such a

conclusion would demonstrate that after the Correa incident, Deputy Prado

strategically sought out locations where he could use excessive force on inmates

without being observed.  The other acts therefore could demonstrate to a rational

jury that Deputy Prado was concerned about a supervisor or deputy walking past

the Multi-Purpose Room during the Henderson incident and therefore he wanted to

monitor the hallways for signs of anyone approaching.  If a rational jury discredits

Henderson's testimony that Deputy Prado kicked him, a rational jury could make

use of the other acts evidence described above to conclude that Deputy Prado's

presence at the door of the Multi-Purpose Room during the incident was more than

"mere presence."  Such a conclusion would determine whether Deputy Prado was

liable, and therefore would be a material issue in the case.

     The other acts evidence is also potentially relevant to demonstrate Deputy

Prado's intent.  One theory of plaintiff's case may be that Deputy Prado engaged in

"sadistic and malicious infliction of pain or injury for the very purpose of causing

harm" to Henderson.  To the extent that a jury credits the testimony about the other acts, it could rationally conclude that Deputy Prado's actions in the Henderson incident were "sadistic and malicious."  *Cf. Eng. v. Scully*, 146 F.R.D. 74, 80 (S.D.N.Y. 1993) ("Plaintiff seeks to introduce reports of incidents in which Defendants used force on occasions besides the September incident.  The admissibility of evidence of this type is governed by Rule 404(b) of the Federal Rules of Evidence. . . .  Evidence of incidents involving Defendants' use of force is probative of their intent or motive in the instant case.  'A plaintiff in an excessive force case is entitled to prove by extrinsic evidence of other instances that the police officer defendant acted "maliciously and sadistically for the very purpose of causing harm."'" (quoting *Ismail v. Cohen*, 706 F. Supp. 243, 253 (S.D.N.Y. 1989), *aff'd*, 899 F.2d 183 (2d Cir. 1990))).  The other acts evidence may be particularly relevant where the jury may not have much direct evidence of Deputy Prado's intent in the incident in question.  Therefore, the Court disagrees with defense counsel's contention that "while Deputy Young and Deputy Napata's motives may be key factors in this case, Deputy Prado's motive is not." Defendant's Motion for Mistrial [hereinafter "Motion"] at 5.  Plaintiff must demonstrate that Deputy Prado had an improper motive, as described in Jury Instruction 14, and must demonstrate that Deputy Prado was not merely present, as

described in Jury Instruction 15.  The other acts evidence may be highly probative of the jury's determination of whether Deputy Prado acted "maliciously and sadistically."

A rational jury may also consider the other acts evidence relevant to examining whether Deputy Prado's actions lacked a "valid penological purpose." For example, Pleitez testified that before the incident occurred in the processing room, Deputy Prado stated, "I'm the boss and you messed with somebody in black."[2]  This testimony may suggest to a rational jury that Deputy Prado's motive in the Henderson incident was not to restrain a violent or non-compliant inmate, but to ensure that Henderson knew who was "the boss" and to punish him because he "messed with" Deputy Young, who, like all the deputies in the jail, wears a black uniform.  As the Court posited before hearing the evidence, Pleitez's testimony may allow a rational jury to conclude that "Deputy Prado was pursuing a 'plan' of intimidating inmates through the use of force."  Order Granting in Part Plaintiff's Motion in Limine No. 7 [hereinafter "Order"] at 7.  Houston's testimony similarly suggested that Deputy Prado may have been using force against him as a means of intimidation after Houston's incident during his intake on a lower floor of

---

[2] This is the Court's best effort to represent Arturo Pleitez's testimony on September 28, 2007.

the jail building.  Perez's testimony also suggested that Deputy Prado may have been using force several minutes after the inmate engaged in non-compliant conduct.  The jury heard testimony that deputies are not allowed to use force as a form of punishment or retaliation, Prado Tr., Sept. 25, 2007, at 6, 9, and the Pleitez, Houston, and Perez testimony may suggest that Deputy Prado had improper motives for using force against Henderson.

The other acts evidence may also be relevant to a rational jury's conclusion that Deputy Prado had a "plan" to deny allegations of excessive force by claiming that inmates had posed a physical threat, and therefore force was justified.  For example, Deputy Prado testified regarding the Correa incident that "when you have an inmate facing you at that close proximity, there's a possibility for attack." Prado Tr., Sept. 26, 2007, at 87.  While Deputy Prado explained that he needed to use force on Correa "[b]ecause he refused my direct orders," *id.* at 89, he also stated that just before he used force on Correa, "He threw a swing.  In my opinion, he was swinging at me and Deputy Loufas."  *Id.* at 88; *see also* Prado Tr., Sept. 25, 2007, at 13.  With respect to Michael Perez, Deputy Prado testified that after Perez "assaulted me, attacked me," Prado Tr., Sept. 26, 2007, at 98, and then ran downstairs, Deputy Prado caught up to Perez, he had "to get hold of him" "[b]ecause I needed to control him.  He had just attacked me."  *Id.* at 100.  When

11

asked why he used force against Pleitez, Deputy Prado stated, "Because he refused direct orders, and there's a possibility, you know, of also of an attack."[3]  *Id.* at 106. When asked why he used force against Woodfox, Deputy Prado testified, "Because not only did he refuse several orders given to him in the tank and, also, you know, because he – I believe that he had turned around and tried to attack me."  *Id.* at 116. This evidence may lead a rational jury to conclude that Deputy Prado's plan was to use excessive force, for improper purposes discussed above, and then to claim that force was necessary because the inmate posed a physical threat.  To the extent that the jury may credit such a theory, the other act evidence is material to Deputy Prado's testimony that Henderson "was enraged," attacked Deputy Young, and then continued to struggle while on the floor, when Deputy Prado assisted in restraining him.  *Id.* at 122-24.

The other acts evidence may also be relevant to a jury finding that all three of the deputies were pursuing a plan from the moment they arrived at the Multi-Purpose Room.  Henderson testified that all three deputies had gloves on when he saw them in the Multi-Purpose Room.  Henderson Tr., Sept. 26, 2007, at 29-30. That testimony is not contradicted by the testimony of Deputy Napata.  Napata Tr.,

---

[3]Deputy Prado denied that he restrained Pleitez "in order to punish him for throwing a bedroll at your feet," but confirmed that he used force on Pleitez "[b]ecause he refused direct orders."  Prado Tr., Sept. 26, 2007, at 106.

Oct. 2, 2007, at 43 ("I mean, I can't say for sure if I had gloves on or not prior to the door opening up.").  Woodfox similarly testified that Deputy Prado had gloves on during their altercation, which took place in a hallway as Deputy Prado was moving Woodfox from the Main Line to the Multi-Purpose Room.  Deputy Young testified that deputies wear gloves "[t]o protect themselves from bodily fluids, contaminants.  It's a safety part of our safety equipment."  Young Tr., Oct. 1, 2007, at 54.  If the jury credits the testimony of Woodfox that Deputy Prado was wearing gloves before their altercation began, and if the jury credits Henderson's testimony that all three deputies were wearing gloves as the incident transpired in the Multi-Purpose Room, then a rational jury may conclude that the deputies anticipated from the very start that bodily fluids would be involved in the Henderson incident. While Woodfox's testimony is not necessary for this conclusion, a rational jury may find that the testimony suggests that Deputy Prado followed a "plan" to put on gloves in anticipation of having an altercation with an inmate.  A rational jury may conclude from Woodfox's testimony that Deputy Prado followed a practice of putting on gloves prior to using excessive force, in anticipation that the inmate would bleed, and that Deputy Prado, Deputy Young, and Deputy Napata *all* put on gloves before entering the Multi-Purpose Room as part of a similar plan.  As such, the glove evidence may also suggest "absence of mistake" with respect to the cut

13

above Henderson's eye.  If, in fact, the deputies planned to use force that would cause Henderson to bleed, that plan is material to the jury's determination of whether their actions lacked a valid penological purpose.

At this point the Court is simply speculating about possible theories a rational jury may consider.  Thus, the evidence presented at trial points to several ways in which the other acts evidence may be relevant to proving several material issues in the case.  Therefore, the third prong of *Duran* is satisfied.

**B.   THE 404(B) EVIDENCE IS SUFFICIENTLY SIMILAR TO THE INCIDENT IN QUESTION**

Defendants contend that the other acts lack similarity to the Henderson incident because "*not a single one of the other alleged bad acts concerns Deputy Prado acting as a look out for someone else*."  Motion at 6.  The Court refers counsel to the Court's original Order on this matter, in which the Court discussed the degree of similarity required under the fourth prong.  Order at 8-10.  The Court notes in particular that the evidence suggests that Deputy Prado may have been standing lookout in order to avoid consequences similar to those he faced in the Correa incident, where his supervisor viewed his actions on a closed-circuit monitor.  The Court also notes similarity among most of the other acts with respect to where the alleged excessive force took place.  Even if Deputy Prado was not

14

standing lookout in the other incidents, a rational jury could conclude that the fear of repercussions stemming from the Correa incident motivated Deputy Prado to select secluded locations for other incidents, and to stand lookout in the Henderson incident.  The degree of similarity required under these circumstances is only slightly greater than that required to prove motive where "a person commits a second crime in order to cover up the first."  *See United States v. Miller*, 874 F.2d 1255, 1269 (9th Cir. 1989).

For reasons stated above, there is also striking similarity between the Woodfox and Henderson incidents if the jury credits the testimony of both inmates that Deputy Prado was wearing gloves immediately prior to the incidents.

There is also similarity among several of the incidents with respect to Deputy Prado's description of the inmate's signs of imminent violence.  He described Woodfox's behavior as follows: "He immediately turned around, raised up both hands in a fighting stance,"  Prado Tr., Sept. 26, 2007, at 112, and "[A]ll of a sudden he turned around and he kind of bent over with clenched fists." Prado Tr., Sept. 25, 2007, at 43.  He described Correa's stance in a similar manner.  He described Henderson's behavior as follows: "Henderson looked like he was very upset, very agitated.  I could tell his facial expression and the way he was standing. He looked like he was squared off, and his hands were just – he had clenched

fists."  Prado Tr., Sept. 26, 2007, at 122; *see also* Prado Tr., Sept. 25, 2007, at 60,

62.  The similar characterizations are particularly relevant in light of the testimony

of Deputy Young and Deputy Napata.  Deputy Young testified that even after he

had entered the room, ordered Henderson to turn around for handcuffing, and

Henderson disobeyed that direct order, Deputy Young did not feel that a takedown

hold "was necessary at that point.  He wasn't threatening to hit me, so I didn't feel

a need to have to take him down."  Young Tr., Oct. 1, 2007, at 36-37.  Deputy

Napata testified that he did not concur with Deputy Prado's description of

Henderson: "Q: And Mr. Henderson did not seem agitated at all at that point; isn't

that accurate?  A: To me, no."  Napata Tr., Oct. 2, 2007, at 36.

Deputy Prado's asserted justifications for use of force are also substantially

similar.  For every incident, he testified that the inmate both refused to obey an

order, and either initiated some physical force against a deputy or posed a

substantial risk of attacking at the time of the incident.  He testified that

"Henderson attacked Deputy Young," and that Henderson had refused to turn

around to be handcuffed.  Prado Tr., Sept. 26, 2007, at 80.  He testified that Correa

refused "several orders to turn around and face the gate," *id.* at 87, and then "he

was swinging at me and Deputy Loufas."  *Id.* at 88.  When asked why he used

force on Correa, he replied, "Because he refused my direct orders."  *Id.* at 89.  He

16

testified that Perez refused to go downstairs and insisted on looking in the padding, and then that Perez "assaulted me, attacked me."  *Id.* at 98, Prado Tr., Sept. 25, 2007, at 54.  He testified that Pleitez refused to pick up his bedding, and then "started struggling with me."  Prado Tr., Sept. 26, 2007, at 105.  When asked why he used force on Pleitez, Deputy Prado responded, "Because he refused direct orders, and there's a possibility, you know, of also of an attack."  He testified that Woodfox "raised up both hands in a fighting stance," was "fixing to strike me, he's fixing to swing at me," *id.* at 112-13, and "kind of bent over with clenched fists."  Prado Tr., Sept. 25, 2007, at 43.  He also noted that he could not comply with Woodfox's request and not give him a tray, because "now you have a potential for a fight.  Now he's going to want to fight you over the tray."  Prado Tr., Sept. 26, 2007, at 111.  When asked why he used force on Woodfox, Deputy Prado replied, "Because not only did he refuse several orders given to him in the tank, and also, you know, because he – I believe that he had turned around and tried to attack me." *Id.* at 116.

If the jury credits the testimony of the inmate-witnesses, the timing and location of Deputy Prado's use of force against Henderson, Houston, Pleitez, and Woodfox is substantially similar.  In each of the incidents, according to the inmates, the inmate initially engaged in some behavior that might have been

17

perceived as insubordination toward a deputy.  In each of the incidents, according to the inmates, the inmate later was placed in an isolated location, and at that location excessive force was applied as a means to punish them for that behavior and to ensure that the inmate no longer "mess[es] with somebody in black."  One additional common thread among these incidents was Deputy Prado's involvement with the application of force.  A rational jury could conclude from this testimony that Deputy Prado is an important player in a plan to intimidate inmates who are too willing to speak their minds to deputies.

The Court finds that, to the extent similarity is necessary under the circumstances, the other acts are sufficiently similar to the Henderson incident to satisfy the fourth prong of the *Duran* test.

## C.   THE OTHER ACTS EVIDENCE WAS PROPERLY ADMITTED UNDER FEDERAL RULE OF EVIDENCE 403

Defendants argue that "given what has gone on during this trial, the Court's refusal to keep the other act evidence out under Rule 403 is an abuse of discretion." Motion at 6.  First, they argue that the court improperly excluded evidence of Perez's gang affiliation, which would have demonstrated Perez's "*motive* for attacking Deputy Prado."  *Id.*  First, it is unclear how gang affiliation might constitute a sufficient motive to attack Deputy Prado.  Second, even if Perez did in

18

fact attack Deputy Prado, and did in fact attack him out of some gang-related motivation, the evidence presented at trial is still probative in the same way the other Rule 404(b) evidence is probative.  Deputy Prado's testimony suggested that after the incident Deputy Prado caught up to Perez and found that he had slipped and fallen on the floor.  Prado Tr., Sept. 26, 2007, at 99.  Then, as Perez was in the process of getting up, Deputy Prado "got ahold of one of his arms. . . . and then kind of struggled with him for a bit."  *Id.*  The initial altercation had taken place on the seventh floor, and Deputy Prado had pursued Perez to the sixth floor. Defendants' attorney, Mr. Flynn, asked Deputy Prado, "I guess the part that I'm missing is he attacked you, but he was gone.  Now he's no longer going to attack you.  Why did you have to get ahold of him?  What were you going to do with him after you got him?"  Deputy Prado responded, "After – after – my intent was to be able to cuff him and be able to pull him aside and be able to do the proper paperwork I needed to do to be able to let everybody know what he had just done." *Id.* at 100.  The testimony is relevant to the extent that it shows that Deputy Prado used physical force against Perez long after Perez had allegedly used physical force against Deputy Prado.  Perez's motivation for the initial use of force is at best tangentially relevant to the jury's understanding of the story as it relates to Deputy Prado.  Defendants further argue that the Court denied them the opportunity to

19

reveal that Perez perjured himself when he denied having any affiliation with the other inmate present at the scene in the gym.  Motion at 6.  First, the Court notes that it does not have the transcript of Perez's testimony or other records before it to reach any conclusion as to whether Perez committed perjury.  Second, the Court cautions counsel against reaching a conclusion that simply because individuals are "fellow gang members" they were necessarily more than passing acquaintances prior to entering the jail.  Third, Deputy Prado's own testimony about the Perez incident, when he was questioned by Mr. Flynn, his own attorney, is arguably incriminating.  It is difficult to imagine how Perez's purported perjury with respect to his familiarity with another inmate in the gym could rehabilitate Deputy Prado's story.

Second, defendants argue that the Court's rulings with respect to admissibility of prior convictions hampered their ability to undermine the testimony of Jerome Houston.  First, the Court notes that defendants have not referenced any evidentiary obligation to admit evidence of the details of past crimes.  Second, the Court notes that admitting evidence regarding the violent nature of Houston's previous crime to demonstrate that Houston acted with violence toward Deputy Prado would raise admissibility concerns under Rule 404(b), particularly given the lack of similarity between Houston's actions in the

20

prior crime (beating an elderly woman with a telephone) and Houston's alleged actions in the incident described in court (resisting Deputy Prado).  Third, the Court fails to understand how it would be an abuse of discretion under Rule 403 *not* to admit evidence of the details surrounding the crime of Houston's prior conviction. The crime of conviction itself is evidence of violence, and the jury may consider that fact in weighing Houston's testimony.  While the Court understands that defendants would like to describe all of the details of the inmate-witnesses' past crimes, the Court also recognizes that the allegations in this case necessarily involve people with criminal histories testifying that government officials used violence against them.  The prior crimes, no matter how heinous, by definition do not justify an excessive use of force.

Third, defendants argue that inconsistencies between Mr. Candell's opening statement and examination of Deputy Prado and Lieutenant Ginns's testimony about the Correa incident warrant a mistrial.  Motion at 7.  First, the Court notes that Jury Instruction 6 informs the jury that "[c]ertain things are not evidence, and you may not consider them in deciding what the facts are."  Among those things are "[a]rguments and statements by lawyers," including "[w]hat they have said in their opening statements" and "[q]uestions . . . by lawyers."  Second, the testimony of Lieutenant Ginns and Deputy Prado, to the extent that it "does not support

plaintiff's dramatic presentations" of the incident between Correa and Deputy

Prado, is the only evidence about the incident that is before the jury.  The Court

speculates that Lieutenant Ginns' absence from the state prior to trial may have

interfered with Mr. Candell's ability to review her testimony to prepare for his

opening statement and his examination of Deputy Prado.  The Court recognizes

that it would be strategically unwise for an attorney to make "dramatic

presentations" about an alleged incident while knowing that the attorney will call a

witness who will not confirm their accuracy.  The Court recognizes that the jury

instructions will cure any unfair prejudice that Mr. Candell's "dramatic

presentations" of the Correa incident may have created.

Fourth, defendants argue that the Court erroneously admitted evidence of the

Sheriff's Department's allegations of Deputy Prado's use of excessive force and

insubordination.  Motion at 7.  Even if the allegation was not written "at or near the

time" of the alleged use of excessive force, it may have been written "at or near the

time" of the investigation of the alleged use of excessive force, and therefore may

be a business record of the investigatory process.  Federal Rule of Evidence 803(6)

requires that the record be made "at or near the time" of "acts, events, conditions,

opinions, or diagnoses."  Therefore, the document may be admitted as a business

record if it states an opinion regarding Deputy Prado's insubordination or use of

excessive force, as long as the document reports that opinion "at or near the time" the opinion was made.  It need not be created "at or near the time" of the "event" of the alleged Correa incident.  The document was therefore properly admitted as a business record.

The Court notes that it adopted Jury Instruction 19 to accommodate defendants' concerns about the risk of improper use of 404(b) evidence.  In light of that instruction, and for reasons stated in this Court's previous Order, the other acts evidence was properly admitted under Rule 403.  Order at 11-12.

## II.  THE PUNITIVE DAMAGES MATTER HAS BEEN RESOLVED THROUGH JURY INSTRUCTIONS

Defendants argue that a mistrial is warranted because plaintiff argued during opening statement "that a message should be sent to the City in awarding punitive damages."  Motion at 8.  The Court notes that it will offer the following jury instructions relating to punitive damages.

Jury Instruction 26:

> If you find for the plaintiff, you may, but are not required to, award punitive damages in addition to compensatory or nominal damages. The purposes of punitive damages are not to compensate a plaintiff, but to punish an individual defendant and to deter the defendant and other individuals from committing similar acts in the future.  The purposes do not include deterring the City and County of San Francisco. . . .

23

Jury Instruction 29:

> The City and County of San Francisco is not a defendant in this case. The only defendants in this case are Larry Napata, Miguel Prado, and Glenn Young.

Guided by these instructions, the jury will not "believe[ ] that it is appropriate to award punitive damages to send a message to a non-defendant public entity for inadequate training and investigations."  Motion at 8 (emphasis removed).  The Court also notes that it is possible that "the punitive damage award will be paid by the City," *id.*; *see* West's Ann. Cal. Gov. Code § 825(b), and that the state statutory language warranting a mistrial for mention of this fact does not apply in the instant case.  *See Larez v. Holcomb*, 16 F.3d 1513, 1521 n.8 (9th Cir. 1994); *see also In re Exxon Valdez*, 229 F.3d 790, 800 (9th Cir. 2000); *Lawson v. Trowbridge*, 153 F.3d 368, 379 (7th Cir. 1998).  In the utmost of caution, however, the Court has decided to issue the above-quoted instructions with regard to punitive damages and the City's liability.

CONCLUSION

For the reasons set forth above, the Court DENIES Defendant's Motion for Mistrial.


IT IS SO ORDERED


Dated:       October 9, 2007


By:   _____
        The Honorable William A. Fletcher
        United States Circuit Judge for the
           Court of Appeals of the Ninth Circuit,
           sitting by designation

25